IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JOYCE PINCKNEY,<br>Plaintiff,<br><br>v.<br><br>BLUE CROSS BLUE SHIELD OF<br>TENNESSEE, INC.,<br>Defendant. | NO. 3:05-00962<br>JUDGE HAYNES |

## MEMORANDUM

Plaintiff, Joyce Pinckney, filed this action under the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. § 1001 et. seq., against Defendant Blue Cross Blue Shield of Tennessee, Inc. ("Blue Cross"), a Tennessee non-profit corporation that provides health insurance and is the administrator of the employer's health care plan under which Plaintiff is entitled to benefits. Plaintiff asserts claims against Defendant for wrongful denial of ERISA benefits. The Defendant filed the Administrative Record ("AR") (Docket Entry No. 19).

Before the Court is Plaintiff's motion for judgment on the record,[1] (Docket Entry No. 21), contending, in sum: (1) that the Defendant's decision denying Pinckney's claim was not based upon a reasonable interpretation of the Plan's provisions; (2) that the Defendant did not provide a reasoned explanation for its denial of benefits; (3) that the Defendant's decision is not supported by substantial evidence; and (4) that the Defendant's decision was arbitrary and capricious.

The Defendant filed its cross-motion for judgment on the record, (Docket Entry No. 27), contending, in essence: (1) that Defendant provided Plaintiff with its definition of an "investigative" medical treatment that was relied upon by its committee in denying Plaintiff's

---

[1] In ERISA cases, a motion for judgment is the appropriate procedural method for judicial review. Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 619 (6th Cir. 1998).

claims; (2) that the Defendant's interpretation of the Plan's relevant provisions on investigative services is reasonable; (3) that the Defendant's committee properly exercised its discretion in determining that the Plaintiff's claims were not covered under the Plan.

For the reasons set forth below, the Court concludes that the Defendant acted arbitrarily and capriciously in denying Pinckney's claim for benefits under her ERISA Plan. The Defendant failed to collect and to consider material facts, as required by the Plan, including Plaintiff's medical records and the health provider's protocol and the objective effectiveness of its treatment. Several of the medical authorities cited by the Defendant in its decision denying Plaintiff's claims, do not apply to Plaintiff's medical condition. Thus, the Defendant failed to provide a reasoned explanation for its denial of Plaintiff's medical treatment as issue.

## A. REVIEW OF THE RECORD[2]

Pinckney is a member of a group health plan for the Nashville law firm of Howell & Fisher, her husband's employer. AR at 0007. Blue Cross is Pinckney's medical insurer and administrator of the Howell & Fisher group health plan. See AR.

In April 2002, Dr. Gary Jackson, Pinckney's treating physician, performed surgery to remove a large acoustic neuroma (brain tumor) from Pinckney. AR at 0009. The tumor and surgery caused facial nerve damage resulting in the loss of functional eye protection, and difficulties with speech and swallowing. AR at 0083. If these conditions remain untreated, these problems could become serious. Loss of eye protection leads to eye dehydration and exposure of the eye can result in corneal disease, requiring a transplant. AR at 0009. Difficulty in

---

[2] The scope of a district court's review of the denial of ERISA benefits is limited to the administrative record available to plan administrators in its final decision. Marks v. Newcourt Credit Group, Inc., 342 F.3d 444, 457 (6th Cir. 2003).

2

swallowing can cause aspiration and pneumonia that may require hospitalization. Id. Dr. Jackson opined that facial rehabilitation (neuromuscular or facial reeducation) was "medically necessary" for Pinckney's recovery. Id.

In April 2003, Pinckney solicited information about the facial reeducation program at the University of Wisconsin Hospital. Id. In an April 22, 2003 letter, the University of Wisconsin Hospital and Clinics ("UWH") described its program as follows:

> [T]he Neuromuscular Retraining Clinic...primarily serves the post-acute (one or more years after onset of illness or injury), neurologically injured patient. Our Clinic is based on clinical research that indicates there is no limit to when functional recovery can take place after neurological injury. At NMRC we see patients from across the country on a limited-stay, outpatient basis. During clinic visits, emphasis is placed on giving patients simple methods to train themselves. After the initial evaluation and development of the home program, patients are sent home to practice these retraining strategies daily. They then return to the Clinic on a periodic basis to update the program as progress is achieved. Through this educational process, patients become their own best therapist; and, as a result, know that they are in direct control of their progress...
>
> * * *
>
> Jacqueline Diels, OTR, an occupational therapist who specializes in facial rehabilitation provides evaluation and treatment. Comprehensive evaluation includes the Wisconsin Functional Rating Scale, Sunnybrook Facial Grading System (FGS), videotape, photographs, and, where applicable, surface electrode electromyography (EMG). Because treatment requires a complete evaluation by a therapist and training of the patient, we are unable to provide specific retraining information without first seeing the patient at our clinic.

AR at 0011 (emphasis added).

UWH's neuromuscular retraining clinic bills its services as "outpatient occupational therapy" and uses the five-digit commercial codes of insurance companies and medical providers (97003, 97112, 90901) to identify its facial retraining therapy. Id.

On April 23, 2003, Pinckney telephoned Blue Cross to inquire if the Blue Cross policy

3

covered UWH's facial rehabilitation services for which Pinckney provided two medical billing codes, 97003 and 97112. AR at 0003. A Blue Cross customer service representative advised Pinckney that code 97003 was a covered benefit, subject to medical necessity. Id. This Blue Cross representative further advised Pinckney that code 97112, neuromuscular reeducation, was not a covered service because Blue Cross's medical policy considered that service "investigative" and excluded that treatment from coverage under Pinckney's policy. AR at 0003, 0057. On June 18, 2003, Pinckney again telephoned to verify benefits for occupational therapy under three codes: 97003, 97112 and 90901. AR at 0003.

From August 25-27, 2003, Pinckney received facial reeducation services at UWH's clinic at a cost of $2,839.20. AR at 0003. Pinckney submitted her claim for this service to Blue Cross and on September 24, 2003, Pinckney telephoned to inquire about her claim's status. AR at 0004. The Blue Cross representative informed Pinckney that her claims for these services were denied as "investigative" or "investigational" treatments. Id.

On September 30, 2003, James Smith, Pinckney's insurance broker, sent an e-mail to Blue Cross requesting the reason(s) for its denial of Pinckney's claim. AR at 0004. The Blue Cross representative informed Smith that Blue Cross considered the codes that Pinckney supplied to be for "investigative" treatment. Id. In a subsequent telephone conversation, a Blue Cross representative told Smith that Blue Cross would listen a tape of the earlier telephone call to determine if the Blue Cross representative researched each code to determine coverage. Id. After listening to the telephone tape, the Blue Cross representative found that each code had not been checked before Pinckney's claims for occupational therapy benefits were denied. Id. The Blue Cross representative telephoned Pinckney to relay this information. Id.

4

The Defendant's Plan contains definitions of an "investigational service that are as follows:

> **Experimental or Investigational Service** - A drug, device, treatment, therapy, procedure, or other service or supply that does not meet the definition of Medical Necessity[3] or:
>
> > a. cannot be lawfully marketed without the approval of the Food and Drug Administration ("FDA") when such approval has not been granted at that time of its use or proposed use, or
> >
> > b. is the subject of a current Investigational new drug or new device application file with the FDA, or
> >
> > c. is being provided according to Phase I or Phase II clinical trials or the experimental or research portion of a Phase III clinical trial (provided, however, that participation in a clinical trial shall not be the sole basis for denial), or
> >
> > d. is being provided according to a written protocol which describes among its objectives, determining the safety, toxicity, efficacy or effectiveness of that service or supply in comparison with conventional alternatives, or
> >
> > e. is being delivered or should be delivered subject to the approval and supervision of an Institutional Review Board ("IRB") as required and defined by Federal regulations, particularly those of the FDA or the Department of Health and Human Services ("HHS"), or
> >
> > f. The Office of Health Care Technology Assessment within the Agency for Health Care Policy and Research within HHS has determined that the service or supply is either Experimental or Investigational or that there is insufficient data to determine if it is clinically acceptable, or
> >
> > g. in the predominant opinion of experts, as expressed in the published authoritative literature, that usage should be substantially

---

[3] BCBST defines medically necessary as a service of proven value for use in the general population. To qualify as medically necessary, the service: (1) must have final approval from the appropriate government regulatory body; (2) have scientific evidence permitting conclusions regarding the beneficial effect of the service; (3) improve the net health outcome; (4) be as beneficial as any established alternative; and (5) demonstrate improvement outside the investigational setting. (Docket Entry No. 1-4, Evidence of Coverage at p. 18).

5

confined to research settings, or

h. in the predominant opinion of experts, as expressed in the published authoritative literature, further research is necessary in order to define safety, toxicity, efficacy, or effectiveness of that Service compared with conventional alternatives, or

i. The service or supply is required to treat a complication of an Experimental or Investigational Service.

AR at 0066-67.

Blue Cross's policy refers to "investigational" treatment as failing to satisfy the specific requirements from Blue Cross's Technology Evaluation Center ("TEC"). AR at 0049. According to Blue Cross's medical policy manual, this Neuromuscular Reeducation fails to satisfy the following criteria that are set by its TEC:

- The scientific evidence does not permit conclusions concerning the effect of the technology on health outcomes

- It is unknown if the technology improves net health outcomes.

- It is unknown if the technology is as beneficial as any established alternatives.

- It is unknown if improvement is attainable inside or outside investigational settings.

Id.

As pertinent here, Blue Cross's medical policy includes neuromuscular reeducation under the code 97112. AR at 0049. The procedure is described as:

...a therapeutic technique that is used to improve balance, coordination, posture, kinesthetic sense and proprioception. There is no precise description of what neuromuscular reeducation entails. Treatment may include balance exercises such as one-legged standing and the progressive use of a wobble board. Tandem exercises along with a postural challenge may be utilized to evaluate stability. The individual receiving treatment is encouraged to feel the correct position of joints and to perceive the direction of movement of the body extremities. The Feldenkrais Method for neuromuscular

6

reeducation is a learning process that focuses on the connection of the mind to the body. This method uses relaxation, massage of pressure points and movement therapy to achieve rehabilitation. The Bobath approach teaches the caregiver positioning techniques that assist in the change of abnormal postures and movements interfering with functional skills. The Bobath approach is used mainly for individuals with cerebral palsy.

Id. (emphasis supplied). In its medical policy, Blue Cross cites 10 sources relied upon in its classification of this therapy as investigational.. AR at 0050.

Under the Plan, Blue Cross's medical director has discretion to determine whether a particular treatment or service is "investigative." AR at 0056, subject to review of relevant sources:

> If Our Medical Director does not Authorize the provision of a service or supply, it will not be a Covered Service. <u>In making such determinations, Our Medical Director shall rely upon any or all of the following, at his or her discretion</u>:
>
> (1) <u>Your medical records</u>, or
>
> (2) <u>the protocol(s) under which proposed service or supply is to be delivered</u>, or
>
> (3) any consent document that You have executed or will be asked to execute, in order to receive the proposed service or supply, or
>
> (4) the published authoritative medical or scientific literature regarding the proposed service or supply in connection with the treatment of injuries or illnesses such as those experienced by You, or
>
> (5) regulations and other official publications issued by the FDA and HHS, or
>
> (6) the opinions of any entities that contract with the Plan to assess and coordinate the treatment of Members requiring non-Experimental or Investigational Services, or
>
> (7) the findings of the BlueCross and BlueShield Association Technology Evaulation Center or other similar qualified evaluation entities.

7

AR at 0067. (emphasis added).

In November 2003, Pinckney filed a grievance with Blue Cross about its denial of her claims for facial reeducation and its classification of this procedure as "investigative" or "investigational". AR at 0004 and 0014. In a letter dated January 7, 2004, Blue Cross's grievance committee upheld the denial of Pinckney's claims and explained that if Pinckney were dissatisfied, then she could request review before the Level II Grievance Committee. AR at 0064. The grievance committee attached to its letter the Plan's definition of "investigational" and its policy on neuromuscular reeducation. Id. at 0064. As to its specific reasons, Blue Cross's letter states:

> After review of all available information, the Committee determined that this service is considered investigative based on BCBST medical policy and thus is excluded from coverage in accordance with the terms of your health benefits plan. Therefore, the denial of the charge for this service is upheld. Please reference the enclosed wording from your Evidence of Coverage (1) defining Investigational Services, pages 35-36, (2) under the heading **Attachment B: Exclusions from Coverage,** page 61, including item No. 3 on that page, and (3) the enclosed BCBST medical policy on Neuromuscular Reeducation.

Id. (emphasis supplied).

This letter informed Pinckney that failure to follow the attached instructions for a second level review could result in the denial of her request to reconsider. Id. Yet, the letter also stated that a second level appeal is unnecessary if her plan were governed by ERISA, as here. Id. AR at 0065.

In response to Pinckney's request for further explanation, in a letter dated December 29, 2005, Dr. Kenneth Patric, Senior Director and Chief Medical Officer, summarized Blue Cross's guidelines for "investigational" services and stated that facial reeducation is investigational

8

because there is "insufficient objective evidence to indicate the therapy improves the health of patients or is as beneficial as other alternatives." AR at 0095.

## B. CONCLUSIONS OF LAW

The purpose of the Employee Retirement Income Security Act of 1974 (ERISA), is to require minimum standards to protect employees and their dependents to ensure equitable character and financial soundness of employer implemented and administered plans. 29 U.S.C. § 1001.

For civil actions under ERISA there are different standards of judicial review. For the relevant standard, the inquiry is whether the plan's administrator has the discretion to decide eligibility for benefits. Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Miller v. Metro Life Ins. Co., 925 F.2d 979, 983 (6th Cir.1991). If the ERISA plan's administrator has the authority to construe the terms of the policy and determine which benefits are covered, then the appropriate standard of judicial review is arbitrary and capricious. Firestone, 489 U.S. at 115; Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 380 (6th Cir.1996).

In the absence of language giving the plan's administrator discretionary authority to construe the policy, the appropriate standard of review is de novo. Firestone, 489 U.S. at 115. Under the de novo standard, the district court must "determine whether the administrator or fiduciary made a correct decision" without deference to either the fiduciary's determination of benefits of the correctness of the decision itself. Id.

Here, the Howell & Fisher Plan provides Blue Cross with the following authority:

> The Group has delegated discretionary authority to make any benefit or eligibility determinations to the Plan. It has also granted the authority to construe the terms of Your Coverage to the Plan. The Plan shall be deemed to have properly

9

exercised that authority unless it abuses its discretion when making such
determinations, whether or not the Group's benefit plan is subject to ERISA.

(Docket Entry No. 1-3, Evidence of Coverage at p. 6). In other portions of the Plan, Blue Cross's medical director possesses the discretionary authority to determine which treatments are covered under its policy. AR at 0056. Unless authorized by the medical director, a particular treatment or service is not covered under the Plan. AR at 0057.

Based upon these provisions of the Plan, the Court concludes that the applicable standard of review is arbitrary and capricious. The Sixth Circuit defined this standard as follows:

> The arbitrary and capricious standard is the least demanding form of judicial review of administrative action. When applying the arbitrary and capricious standard, the Courts must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious.

Smith v. Continental Cas. Co., 450 F.3d 253, 259 (6th Cir.2006) citing Williams v. Int'l Paper Co., 227 F.3d 706, 712 (6th Cir.2000). To withstand judicial review, an administrator's decision must be based on a reasonable interpretation of the plan and the administrator must have the ability to articulate a reasoned, evidentiary-based explanation for the outcome. Powell v. Premier Mfg. Support Servs., Inc., No. 1-05-0012, 2006 WL 1529470 at *8 (M.D. Tenn. June 1, 2006).

To determine whether an abuse of discretion occurred, the Court must also consider whether a conflict of interest exists. A conflict of interest exists "when the insurer both decides whether the employee is eligible for benefits and pays those benefits." Evans v. Unumprovident Corp., 434 F.3d 866, 876 (6th Cir.2006) (citing Gismondi v. United Techs. Corp., 408 F.3d 295, 299 (6th Cir.2005)). The Sixth Circuit defined this conflict of interest for ERISA purposes in Killian v. Healthsource Provident Adm'rs, Inc., 152 F.3d 514 (6th Cir.1998):

10

> "[T]here is an actual, readily apparent conflict...not a mere potential for one" where a company both funds and administers [the policy] because "it incurs a direct expense as a result of the allowance of benefits, and it benefits directly from the denial or discontinuation of benefits."... [B]ecause [the] defendant maintains such a dual role, "the potential for self-interested decision making is evident."

Killian, 152 F.3d at 521.

Here, Blue Cross determines classifications of services as investigational and experimental and pays for the services. AR at 0057. Blue Cross has a financial interest in classifying services as experimental or investigational to avoid paying benefits. Accordingly, Blue Cross's conflict of interest is a factor on whether an abuse of discretion occurred here. On the effect of this conflict, the Supreme Court stated in Firestone: "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" Firestone, 489 U.S. at 109 (quoting Restatement (Second) of Trusts § 187, Comment d (1959)). Less deference may be given upon proof that the denial was motivated by self-interest or bad faith. See Peruzzi v. Summa Medical Plan, 137 F.3d 431, 433 (6th Cir.1998).

The administrator's decision must be "based on a reasonable interpretation of the plan," and it must be "possible to offer a reasoned explanation, based on the evidence, for a particular outcome." Evans, 434 F.3d at 867. The administrator's decision will be upheld "if it is the result of a deliberate reasoned process and if it is supported by substantial evidence." Id. (quoting Baker v. United Mine Workers of America Health & Retirement Funds, 929 F.2d 1140, 1144 (6th Cir.1991)). The Court's review "inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issue." Id. (quoting McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir.2003)). As a general rule, the

11

administrator's written decision and the information in the administrative record are the bases for judicial review. Peruzzi, 137 F.3d at 433-34.

Dr. Patric asserts that he reviewed Pinckney's procedure, the relevant scientific evidence and the Blue Cross medical policy in his determination that facial rehabilitation therapy is investigational. AR at 0085. Dr. Patric's reasons for denying Pinckney's claim are as follows:

> ...[T]he scientific evidence does not permit conclusions concerning the effect of the technology on health outcomes; it is unknown if the technology improves net health outcomes; it is unknown if the technology is as beneficial as any established alternatives, and/or it is unknown if improvement is attainable inside or outside investigational settings. <u>As such, the treatment is considered Investigational under the plan because in the predominant opinion of experts, as expressed in the published authoritative literature, further research is necessary in order to define safety, toxicity, efficacy, or effectiveness of that Service compared with conventional alternatives.</u> The Plan excludes coverage for Experimental or Investigational services or treatment.

AR at 0085 (emphasis added).

To be sure, under its plan, Blue Cross's medical director can rely upon "the published authoritative medical or scientific literature regarding the proposed service or supply in connection with the treatment of injuries or illnesses such as those experienced by You" in his/her determination of coverage. AR at 0056. Yet, of the 10 sources Dr. Patric relied upon for Blue Cross's classification as "experimental", five are irrelevant to Pinckney's condition:

- American Chiropractic Association (ACA) Council on Chiropractic Physiological Therapeutics and Rehabilitation. *Physiotherapy and rehabilitation guidelines for the chiropractic profession.*

- The Bobath Centre. *The Bobath approach.*

- Johnson, D.K., Frederick, J., Kaufman, M., Mountjoy, B.A. (1999). A controlled investigation of bodywork in multiple sclerosis.

- Langhammer, B., Stanghelle, J.K. (2000). Bobath or motor relearning programme? A

12

comparison of two different approaches of physiotherapy in stroke rehabilitation: A randomized controlled study.

- Lennon, S., Baxter, D., Ashburn, A. (2001) Physiotherapy based on the Bobath concept in stroke rehabilitation: a survey within the UK.

AR at Blue Cross0049-50. Pinckney's condition had nothing to do with chiropractics, cerebral palsy[4], multiple sclerosis or a stroke. In other words, at least half of the medical authorities that Blue Cross's medical director relied upon are inapplicable to Pinckney's condition. The remaining articles on the Feldenkrais method and sports medicine are not explained as relevant to Pickney's condition.

Blue Cross's grievance committee's decision to deny benefits was based upon Blue Cross's policy on Neuromuscular Reeducation. AR at 0064. Blue Cross's policy describes neuromuscular reeducation as a therapeutic process designed to improve balance, posture and coordination. AR at 0049. Pinckney's medical records do not suggest that she had any difficulties with her balance, posture or coordination. Pinckney's problems were the result of facial nerve damage and her therapy focused on her face. Blue Cross does not explain the definition of neuromuscular reeducation to the medical therapy that Pinckney received for her partial facial paralysis. AR at 0011.

Although stated as mandatory in its policy, AR 0067, Blue Cross did not review Pinckney's medical records. AR at 0010, 67. Contrary to its policy, Blue Cross did not request UW Health to explain its protocol for facial treatment. Id. Blue Cross did not analyze Dr. Jackson's letter, as Pinckney's treating physician, on the need and viability of reeducation therapy

---

[4] According to Blue Cross's medical policy, the Bobath approach is used with individuals with cerebral palsy. AR at 0049.

13

for improvement in her condition. Thus, the Court finds that contrary to its policy, Blue Cross failed to explain the application of the relevant scientific or medical evidence to Pinckney's specific medical condition and the specialized treatment she received. General references to medical journals that are not tied to a person's medical condition, needs and therapy, leave the Plaintiff and the Court without essential tools to assess whether the ERISA administrator made a reasoned decision. To accept Blue Cross's conclusory explanation deprives the Court of meaningful judicial review. Thus, the Court finds that Blue Cross's decision denying Pinckney's benefits was arbitrary and capricious.

The next issue is whether the Court should award prejudgment interest. As a matter of equity, the district court has the discretion to award prejudgment interest in ERISA cases. Ford v. Uniroyal Pension Plan, 154 F.3d 613, 616 (6th Cir.1998). Blue Cross had no legitimate evidentiary basis for denying of Pinckney's claim and ignored the materials she submitted in support of her grievance. The Court concludes that granting prejudgment interest will give Pinckney the value of her benefits under the Plan. Failure to award prejudgment interest is equivalent to rewarding Blue Cross for its erroneous decisions that may be motivated by economic interests. The rate of prejudgment interest will be determined under Tennessee law unless Blue Cross can demonstrate that this state law overcompensates Plaintiff. Ford, 154 F.3d at 619.

On the issue of attorney's fees, the Sixth Circuit has articulated:

Under 29 U.S.C. 1132(g)(1) a "court in its discretion may allow a reasonable attorney's fee and costs of action to either party." A district court must consider the following factors in deciding to award attorney fees, (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve

14

significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.

Schwartz v. Gregori, 160 F.3d 1116, 1119 (6th Cir. 1998) (quoting Secretary of Dep't of Labor v. King, 775 F.2d 666,669 (6th Cir. 1985)), cert denied, 526 U.S. 1112, 119 S.Ct. 1756, 143 L.Ed.2d 788 (1999).

For the same reasons stated on prejudgment interest, the Court finds that Blue Cross is culpable and it is unquestioned that Blue Cross can afford an award of attorney's fees. An award of attorney fees will serve to encourage reasoned explanations for denial of benefits to the members of the Plan.

## C. CONCLUSION

For the reasons stated above, the Court concludes that Plaintiff's motion for judgment on the record (Docket Entry No. 21) should be granted; that Defendant's motion for judgment on the record (Docket Entry No. 26) should be denied; Plaintiff may file an application for attorney fees and costs in accordance with Local Rule 54.01.

An appropriate Order is filed herewith.

**ENTERED** this the 9th of January, 2007.

WILLIAM J. HAYNES, JR.
United States District Judge